*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SHEL-DEN CORPORATION, doing business as
SPEED CLEAN SERVICES,

        Plaintiff-Appellee/Cross-Appellant,

v

STEVEN THIBAULT and CHRYSTYNA
THIBAULT,

        Defendants-Appellants/Cross-
        Appellees.

UNPUBLISHED
August 21, 2025
11:06 AM

No. 367724
Macomb Circuit Court
LC No. 2020-001862-CK

Before: YOUNG, P.J., and LETICA and KOROBKIN, JJ.

PER CURIAM.

In this action involving contractual services for cleaning and restoration after a home fire, defendants, Steven Thibault and Chrystyna Thibault, appeal as of right from the final judgment, and plaintiff, Shel-Den Corporation d/b/a Speed Clean Services, has filed a cross-appeal. We affirm the trial court's findings in part, reverse the verdict in part, and remand this matter for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

In November 2019, defendants, Steven Thibault (Dr. Thibault) and Chrystyna Thibault (Mrs. Thibault), suffered a fire at their residence in Macomb County, Michigan, that caused substantial damage. In December 2019, they hired plaintiff to clean and restore their house in preparation for reconstruction. Although Mrs. Thibault signed an agreement for the work, plaintiff could not determine the exact cost for its services at the time they entered into the agreement. Instead, plaintiff provided an estimate between $100,000 and $150,000. After approximately 22 days of work, plaintiff submitted an invoice for the work, but defendants questioned some of the charges. In February 2020, plaintiff submitted a final invoice, which detailed its services and all charges for a total balance owed of $121,264.24.

After defendants failed to pay the final invoice, plaintiff sued defendants for breach of contract, fraud or fraud in the inducement, and a declaratory judgment. The parties separately

moved for summary disposition. The trial court granted partial summary disposition for plaintiff on its claim for breach of contract because defendants admitted in their answer that they had a contract with plaintiff. Accordingly, defendants had no defense to failing to pay plaintiff, MCR 2.116(C)(9). The court dismissed the remaining claims brought by plaintiff for fraud and a declaratory judgment.

This case proceeded to a five-day bench trial on the only remaining issue, plaintiff's damages. On May 10, 2023, the trial court stated its findings of fact and conclusions of law on the record, determining that plaintiff was entitled to $93,830 in damages for breach of contract. The court also denied plaintiff's request to recover its attorney fees and interest pursuant to a term in the parties' contract. On July 3, 2023, the trial court entered a judgment for plaintiff in the amount of $93,830.

## II. DEFENDANTS' ISSUES

Defendants have raised three issues on appeal in their statement of questions involved, MCR 7.212(C)(5), concerning their motion for a directed verdict, proof of plaintiff's damages, and the trial court's findings on specific damages. In the discussion of the issues in their brief, defendants have added two issues involving the trial court's decision to grant summary disposition for plaintiff and the court's refusal to sanction plaintiff for failing to produce documents in response to discovery requests. Because defendants failed to include these two issues in their statement of questions involved, they are waived for failing to properly raise them on appeal. *Seifeddine v Jaber*, 327 Mich App 514, 521; 934 NW2d 64 (2019); *River Investment Group, LLC v Casab*, 289 Mich App 353, 360; 797 NW2d 1 (2010); MCR 7.212(C)(5).

## A. MOTION FOR DIRECTED VERDICT

Defendants moved for a directed verdict at the close of plaintiff's proofs. The trial court ruled that plaintiff produced sufficient evidence to support its claim for damages arising from defendants' breach of the contract. To the extent that defendants attempted to argue that there was no enforceable contract, the trial court declined to revisit that issue referencing its earlier grant of summary disposition for plaintiff. Specifically, the trial court ruled that plaintiff was entitled to damages for its claim for breach of contract because defendants acknowledged they had a contract with plaintiff and had no defense for failing to pay plaintiff. Therefore, the only issue for the trial court to address was plaintiff's damages. The trial court concluded that plaintiff supported its request for damages through the testimony of plaintiff's director of operations, Dennis Neumann, Jr. (Neumann). Neumann explained how the charges for this project were assessed and the final invoice sent to defendants which detailed the services provided.

A motion for a directed verdict disputes the sufficiency of the evidence. *Barnes v 21st Century Premier Ins Co*, 334 Mich App 531, 550; 965 NW2d 121 (2020). The motion should be granted when, viewing the evidence in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. *Id*. This Court reviews a ruling on a motion for a directed verdict de novo. *Id*.

Initially, we note that because the judge acted as the factfinder in this matter, defendants should have moved for involuntary dismissal under MCR 2.504(B)(2). *Sands Appliance Servs,*

*Inc v Wilson*, 463 Mich 231, 235 n 2; 615 NW2d 241 (2000). Involuntary dismissal of an action is appropriate where the trial court, when sitting as the finder of fact, at the close of the plaintiff's proofs, is satisfied "that on the facts and the law, the plaintiff has no right to relief." MCR 2.504(B)(2).

> The court may then determine the facts and render judgment against the plaintiff, or may decline to render judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in MCR 2.517. [MCR 2.504(B)(2).]

Here, the trial court considered defendants' motion as one for a directed verdict and the court viewed the evidence in the light most favorable to plaintiff. Accordingly, the trial court did not make any findings at the close of plaintiff's case. Under either of these standards, however, the trial court did not err in denying defendants' motion that they were entitled to judgment in their favor.

A party claiming breach of contract must prove by a preponderance of the evidence that (1) there was a contract, (2) the other party breached the contract, and (3) damages resulted to the party claiming a breach. *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014). "The party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach." *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 550; 904 NW2d 192 (2017) (quotation marks and citation omitted).

For breach of contract, the measure of damages is the pecuniary value of the benefits the plaintiff would have received if the contract had not been breached. *Doe v Henry Ford Health Sys*, 308 Mich App 592, 601; 865 NW2d 915 (2014). Damages that are "conjectural or speculative in their nature, or dependent upon the chances of business or other contingencies" are not recoverable. *Id*. at 602 (citation omitted). "Although breach-of-contract damages need not be precisely established, uncertainty as to the fact of the amount of damage caused by the breach of contract is fatal." *Van Buren Twp*, 319 Mich App at 551 (quotation marks and citation omitted).

Defendants seemingly claim that there was no agreement reached to find that the parties had an enforceable contract, presumably because the parties did not agree on all material terms, including how charges for services would be calculated. Because the trial court had previously granted summary disposition and ruled that there was no question regarding the breach of contract except damages, plaintiff did not have the burden at trial of proving the existence of a contract and defendants may only challenge whether there was sufficient evidence to prove damages. As stated, defendants' challenge to the trial court's summary disposition ruling is waived on appeal, and we reject defendants' attempt to relitigate whether there was an enforceable contract.

Specifically, plaintiff alleged in its complaint that the contract with defendants included performing services at their "home to clean, mitigate, and restore the property after it was damaged by a fire." In their answer, defendants admitted that this paragraph was true. In light of the trial court's ruling to grant summary disposition for plaintiff on the basis of the parties' pleadings, it is apparent that defendants actually conceded that their contract for services with plaintiff included not just cleaning and restoration services, but also included mitigating any damages caused by the

fire. Furthermore, restoration of the property included returning it to pre-fire condition, which could include demolishing any parts of the home that were damaged by the fire, smoke, or water. To the extent that defendants challenge the contract for failing to include all material terms, including plaintiff's performance obligations, that argument lacks merit. Defendants agreed that they entered into a contract with plaintiff to do any work that would clean, mitigate, and restore the property. Furthermore, plaintiff estimated at the beginning of the work that the cost would be between $100,000 and $150,000.

Defendants' further appear to claim that plaintiff did not prove its damages because the charges were recorded using Xactimate, a computer program that assists in the preparation of estimates by contractors and is approved for use by insurance companies. Defendants contend that only Justin Copley (Copley), the project manager for this job, could testify about what work was performed and the proper basis for any charges. Copley no longer worked for plaintiff, and he did not testify at trial. The trial court rejected the argument that Copley's testimony was required because it ruled that the final invoice, prepared using Xactimate, was a business record. Furthermore, Neumann also used Xactimate and was able to testify about its use for this project.

In *Czarnecki v Basta*, 112 Ohio App 3d 418, 422-424; 679 NE2d 10 (1996), the Ohio Court of Appeals held that it was not error for an expert witness to use Xactimate to calculate the plaintiffs' damages. The witness in that case was an estimator for a construction company, and he used Xactimate to estimate the cost to repair damages caused by a roof leak. *Id*. at 422. The court held that the repair summary produced by the witness was properly admitted, even though the amounts were derived by using Xactimate, when the witness had inspected the property and was personally familiar with the costs of materials and labor. *Id*. at 423-424. The witness's estimate of damages was properly admitted, even though it was produced using Xactimate, because the estimate involved facts and data perceived by the expert himself. *Id*. at 424.

Defendants have failed to show that plaintiff could not prove its damages because its final invoice for defendants' contract involved the use of Xactimate to track and calculate the costs of the work performed. Xactimate is simply a tool used by contractors (and insurance companies) to estimate the cost of repairing and reconstructing damaged properties. Because Neumann is certified as a restoration specialist and was plaintiff's director of operations, he was familiar with Xactimate, as well as the costs and time involved in restoring properties after fires. Regardless of Copley's involvement with the project and the use of Xactimate, the final invoice produced using that program was properly treated as a business record. See MRE 803(6).[1] Defendants have not challenged this portion of the trial court's ruling.

Defendants attempt to show that plaintiff's damages lacked reasonable certainty because Neumann agreed that there were some errors and the trial court disallowed certain items included on the final invoice. This does not demonstrate that plaintiff failed to meet its burden in proving

---

[1] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See 512 Mich lxiii (2023). MRE 803 was again amended effective April 11, 2024. See Administrative Order No. 2023-11 (2024). We rely on the version of MRE 803(6) in effect at the time of trial.

other damages. The trial court agreed that certain items were not properly established by plaintiff. But it concluded that, overall, plaintiff showed that it had performed services for defendants and incurred costs related to those services that were recorded using Xactimate and summarized in the final invoice. Examining the trial court's decision de novo, we conclude that it correctly ruled that plaintiff adequately established the basis for damages, relying primarily on its final invoice and Neumann's testimony. *Barnes*, 334 Mich App at 550.

## B. PLAINTIFF'S DAMAGES GENERALLY

Defendants next argue that the trial court's findings awarding plaintiff $93,840 are clearly erroneous. We disagree.

In a bench trial, the trial court's findings of fact are reviewed for clear error, while its conclusions of law are reviewed de novo. *Ladd v Motor City Plastics Co*, 303 Mich App 83, 92; 842 NW2d 388 (2013). "As with other findings of fact, an award of damages is reviewed on appeal pursuant to the clearly erroneous standard." *Jackson v Bulk AG Innovations, LLC*, 342 Mich App 19, 24; 993 NW2d 11 (2022) (quotation marks and citation omitted). "A finding is clearly erroneous where, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made." *Smith v Straughn*, 331 Mich App 209, 215; 952 NW2d 521 (2020) (quotation marks and citation omitted).

Defendants claim that the proofs did not adequately show that plaintiff suffered damages, contending that plaintiff should have offered more definite proof of its damages, including: (1) the charges actually incurred, (2) the number of hours spent on the job, and (3) the number of employees who actually worked on this job. As a result of these deficiencies, defendants allege that plaintiff's proofs failed to establish a "reasonable price" for its services.

While defendants contend that plaintiff was entitled only to its "actual costs," there is no support for that argument because plaintiff is a business providing cleaning and remediation services. The trial court found that the contract contemplated that plaintiff would receive a profit. This contract did not anticipate that plaintiff would be paid only for its actual costs. Moreover, profits are deemed to be an element of the contract and are presumed to have been contemplated by the parties. *Lawrence v Will Darrah & Assocs*, 445 Mich 1, 8 n 2; 516 NW2d 43 (1994). Accordingly, on these facts, plaintiff's damages are not limited to its "actual costs."

Even if the contract did not specify how they would be charged for individual services performed by plaintiff, this fact does not invalidate the contract. Indeed, in *Calhoun Co v Blue Cross Blue Shield of Mich*, 297 Mich App 1, 14-15; 824 NW2d 202 (2012), this Court addressed the absence of the price in a contract:

> Despite the concession that a valid contract existed between the parties, [the] plaintiff's breach-of-contract claim asserts that the failure to specify in the contract the actual dollar amount of the access fee rendered that "contract term" indefinite. In addressing this issue, we are ever mindful that judicial avoidance of contractual obligations because of indefiniteness is not favored under Michigan law, and so when the promises and performances of each party are set forth with

reasonable certainty, the contract will not fail for indefiniteness. *Nichols v Seaks*, 296 Mich 154, 159; 295 NW 596 (1941).

In accordance with this principle, the absence of certain terms—including at times the price—does not necessarily render a contract invalid. Some 40 years ago, in *J W Knapp Co v Sinas*, 19 Mich App 427, 430-431; 172 NW2d 867 (1969), we outlined the general common-law rule that a contract may be enforced despite some terms being incomplete or indefinite so long as the parties intended to be bound by the agreement:

> Even though important terms of the contract were indefinite the trial judge acted properly in supplying the necessary additions. *In an appropriate case an agreement may be enforced as a contract even though incomplete or indefinite in the expression of some term, if it is established that the parties intended to be bound by the agreement, particularly where one or another of the parties has rendered part or full performance. Where the price is indefinite, the purchaser may be required to pay and the seller to accept a reasonable price.* Where the time of performance is indefinite, performance may be required to be rendered within a reasonable time. Each case will turn on its own facts and circumstances. See 1 Corbin on Contracts, §§ 95, 96, 99, 102; 5 Williston on Contracts, § 1459; 1 Williston on Contracts (3d ed), §§ 36, 36A, 40, 41, 49; Restatement, Contracts, § 5. [Emphasis added in *Calhoun Co*.]]

Applying the above analysis to this case, it is apparent that the parties intended to be bound by their agreement for plaintiff to provide remediation services and plaintiff fully performed its obligations. Because the parties only agreed on an estimated range for the price, between $100,000 and $150,000, the trial court could award damages to plaintiff if the court agreed that its damages involved a reasonable price for its performance of the contract.

When applying *Calhoun Co*, 297 Mich App at 14-15, to determine a reasonable price for plaintiff's services, the trial court found that the use of Xactimate supported the charges included in the final invoice:

> Plaintiff argues that defendants expected or should have expected Xactimate to be utilized to prepare the final invoice and that it was discussed, that when the first invoice was submitted on January 3rd, 2020 they didn't ask plaintiff to submit an invoice utilizing a different billing method; they asked them to modify that invoice to reduce the final cost and represent it.

> The Court does find that—that the Court is persuaded by a preponderance of the evidence that Mr. Neumann apprised defendant[s] that he would use Xactimate software to calculate an invoice and that invoice was not contested initially in terms of using Xactimate by [defendants].

-6-

Further, the Court does find that the use of Xactimate, this software is reasonable to the extent that the items that were inputted were not unreasonable. Although Mr. Neumann was not qualified as an expert in the field of remediation, he did testify to be[ing] the director of operations of a remediation company. That's at page 12 of volume one, and hold[s], quote, three Master's designations in restorative cleaning of water, fire and smoke, as well as textile cleaning and has been in the industry since 1997. That's at page 13 of volume one. And again, his testimony of Xactimate being the industry standard is uncontroverted.

So this Court finds by a preponderance of the evidence that the use of Xactimate was appropriate to the extent that the input that was used was reasonable in reaching the total of [the] invoice of $121,264.24. And the Court would refer to volume one, pages 47 through 51, volume 2, 32 through 33.

To support their argument, defendants primarily rely on the testimony of Stacey Janiszewski (Janiszewski), who was plaintiff's office manager and administrative assistant. While testifying, Janiszewski admitted that she did not produce multiple records in response to defendants' discovery requests. However, these records appear to involve only plaintiff's own internal time records for its employees. Other records were produced to show how much time plaintiff's employees spent working on this project. Plaintiff's employees' timesheets and other employment records have not been shown to have significant relevance to determining how many hours the employees spent on defendants' project. Defendants seemingly seek these records to determine how much plaintiff incurred in actual costs for the services provided, but as discussed previously, the trial court was not obligated to determine plaintiff's actual costs in awarding damages when this contract anticipated that plaintiff, as a business, was entitled to earn a profit. Defendants' review of the reasonableness of plaintiff's charges for its services does not entitle them to conduct an audit of plaintiff's entire business and financial practices.

Even if plaintiff did not produce all employees' records, Neumann, by his testimony, established that the final invoice detailed the services performed on this project for defendants. Once again, plaintiff's employee, Copley, used Xactimate to record the services provided to defendants by each room. Defendants focus on plaintiff's failure to prove their damages with reasonable certainty, but the detailed invoice listing all of the work claimed to have been completed on the project was primarily considered by the trial court when that document was admitted as a business record, MRE 803(6), and it was the billing invoice submitted to defendants for payment. Both Neumann and the hundreds of photographs taken by plaintiff at the site proved that the majority of the work was performed, which defendants do not generally dispute, outside of some specific exceptions, which will be discussed later. Because of plaintiff's work, defendants were able to reconstruct their house.

Defendants acknowledge that plaintiff was only required to prove its damages as "reasonably certain." *Calhoun Co*, 297 Mich App at 14-15. This does not require mathematical certainty. *Chelsea Investment Group LLC v City of Chelsea*, 288 Mich App 239, 255; 792 NW2d 781 (2010). Instead, damages are sufficient if a reasonable basis for computation exists. *Id*. As already discussed, we conclude that plaintiff met its burden in generally proving its damages as detailed in the final invoice and as supported by Neumann's testimony and the photographic evidence. Although defendants challenged certain items included in the final invoice as

duplicative, the trial court agreed to reduce or eliminate some items that were inconsistent with other evidence or were erroneously included in the final invoice. Here, defendants have not shown that the trial court's final award of $93,830 was clearly erroneous because plaintiff did not offer more extensive or detailed evidence of its work and expenses.

Defendants raise multiple reasons why plaintiff should not have relied on Xactimate to generally prove its damages on the basis of services provided to defendants. But, defendants did not produce their own witnesses or experts to contest whether Xactimate can be used to accurately document the work performed on a project. As the trial court noted, Neumann established in his testimony that Xactimate is accepted in his industry to track the work performed and document supplies and equipment employed on a project using predetermined pricing accepted by both contractors and insurance companies. Plaintiff demonstrated its damages using Xactimate. To the extent that defendants believed that Xactimate was not a proper means of tracking the work and expenses incurred on the job, it was up to defendants to offer testimony to establish this point. Otherwise, the trial court could only address this issue on the evidence presented. During trial, plaintiff demonstrated that Xactimate is regularly used to generally track the services provided on an individual project and it was used to generate the final invoice for defendants' house.

Thus, the trial court did not clearly err in finding that plaintiff proved its damages using Xactimate to detail the labor, equipment, and supplies used to mitigate defendants' property from the fire damage. Neumann's testimony, in addition to the records generated using Xactimate, allowed plaintiff to show with reasonable certainty the amount of labor and other expenses it incurred to restore defendants' property.

## C. THE TRIAL COURT'S SPECIFIC FINDINGS

Next, defendants challenge specific findings made by the trial court on plaintiff's damages for individual services performed or costs incurred on this job. We conclude that defendants have only shown error with regard to damages for the removal of two bathtubs, entitling defendants to a credit for $150.02 toward the verdict.

Defendants challenge many of the charges for individual services included on the final invoice. Defendants' primary argument is that there was no evidence to support the charges requested by plaintiff. That argument again ignores the testimony from Neumann and the admission of the final invoice, which detailed the services plaintiff provided to defendants. In addition, the photographic evidence showed how much work was done on this project. As previously discussed, the details on the final invoice generally supported the trial court's findings regarding plaintiff's damages. Notably, however, the trial court rejected some charges plaintiff requested because defendants were able to successfully show that the work was not performed or the charges were not justified. Defendants argue that additional items should have been rejected or reduced by the trial court.

Defendants contend that the evidence failed to support the charges for the use of personal protection equipment (PPE) by plaintiff's employees and charges for lighting. In its findings, the court explained that these items were properly included on the final invoice.

Specifically, the final invoice included charges for heavy duty PPE (hazmat suits) ($59.85), PPE gloves ($74.89), full-face multipurpose respirators ($761), and respirator cartridges ($325.31). The charge of $761 for respirators was calculated on the basis of five employees working for 20 days. The cost of respirator cartridges was calculated using an average of four employees working for 22 days.

Defendants allege that the charges for PPE are unreasonable because the photographs of the work site did not show that plaintiff's employees used the PPE after the second day of work. Similarly, the evidence, according to defendants, showed only one hazmat suit was worn. Defendants rely on the lack of photographic evidence showing that each of these items was in use every day claimed. While plaintiff took over 900 photographs over the course of its work to document the services provided, that does not prove that these items were not needed or used for this project. Defendants have not shown that the trial court clearly erred in awarding these expenses to plaintiff.

The final invoice also included a charge of $875 for light fixtures. This charge was for five temporary string lights. Defendants argue that, in late November 2019, they hired an electrician to provide power and lighting to the home. But, there was no evidence offered that the lights included in the final invoice were the same lights that defendants' electrician installed. Given the size of this house, it seems reasonable that additional lights may have been needed at some point and five temporary light fixtures does not seem unreasonable. Defendants have not shown clear error by the trial court in awarding this expense to plaintiff.

The final invoice charged defendants for equipment setup, take down, and monitoring at a rate of $20 an hour for 47.15 hours for a total of $943. The trial court found that, "in regard to equipment setup and monitoring costs and administrative costs of an unspecified nature, these are reasonably charged if related to the service."

Defendants simply claim that this charge should be reduced in half because plaintiff did not show that it was a reasonable charge or actually incurred. This argument lacks merit when, again, the final invoice offered as a business record was documentation of the services provided by plaintiff and Xactimate was used to help determine the charges as they were incurred. Defendants did not offer evidence to show that this service was never performed as charged. Accordingly, no error has been shown.

When the trial court reviewed the details of the charges on the final invoice, it acknowledged that if inaccurate data or unreasonable charges were entered into Xactimate, that would make the invoice inaccurate or unreasonable. The trial court cited an example of a possible unreasonable or inaccurate charge by plaintiff in its findings:

And the clearest example of this is the plaintiff charging for the removal of the toilet paper holder from the side of the vanity and then charging for the discarding of the entire vanity. That's at volume one, page 221 at [sic] 225.

Another clear example is the charging for wallpaper removal and also charging for the removal of the wall itself. That's at volume one, page 212 and 215. The Court find[s] this to be double billing and patently unreasonable and thus

-9-

is deducting the charges from the total amount, and the total amount to be subtracted, looking at the invoice, the Xactimate invoice is $502.05, in that regard.

In its final verdict, the trial court deducted $502.05. Defendants claim that this amount does not include the $5 charge for removal of the toilet paper holder. We disagree. The cost charged by plaintiff for removing wallpaper was $497.05. Adding $5 to that amount results in the charge of $502.05, which is what the trial court subtracted from the final invoice. Defendants are simply incorrect that the trial court did not adjust the verdict amount to account for the toilet paper holder.

Defendants also claim that plaintiff should not have charged a total of $270 for a temporary toilet. The trial court found that charges for equipment rental were reasonable and there was no testimony from someone familiar with the industry that such charges should not be included. Defendants argue that there was no evidence offered that a temporary toilet was necessary for the remediation work. Plaintiff had multiple employees working on defendants' house for full days over more than three weeks. The house was not habitable and, therefore, likely did not have running water. Moreover, the bathrooms were being dismantled as part of the remediation and reconstruction of the house. It therefore is apparent that plaintiff needed to provide facilities for its employees to take bathroom breaks. This charge was reasonable and properly included in the final invoice.

Plaintiff originally charged defendants a total cost of $13,309.24 for content manipulation, which generally involved moving personal property out of the house and disposing of it in dumpsters. While defendants' house contained a great deal of personal belongings that needed to be removed before plaintiff could perform its work, defendants testified that they sorted through and removed much of the property themselves. Plaintiff was asked to remove and dispose of the items left behind. The trial court explained in its findings that plaintiff had overcharged for content manipulation.

The trial court reduced the charges for content manipulation by a significant amount, which defendants acknowledge. Defendants, however, argue that it should be further reduced because the photographs actually showed that most of the contents were gone from the house on the first day and that defendants were responsible for much of that work. They also argue that plaintiff charged for duplicate services when contents were removed from bedrooms and bedroom closets.

Defendants have failed to show that this item should have been further reduced. The trial court adjusted this item after hearing defendants' testimony about their work to sort through their belongings. Even so, the testimony also showed that defendants left items behind that they authorized plaintiff to remove. There was testimony that the house had an extraordinary amount of personal property. Defendants have not explained why this item should have been further reduced when it was established that there was substantial personal property that plaintiff was still required to remove. In total, with the removal of portions of the structure, there were 14 dumpsters used to haul away all damaged materials and items. Defendants' request to further reduce this figure is not supported by the evidence.

Defendants next list multiple other charges they do not believe were proven to be reasonable, simply citing to each room where plaintiff's employees worked. Defendants appear

to challenge the amounts involved because plaintiff charged to remove baseboards, base shoe moldings, and quarter-round moldings or other trim when plaintiff was obligated to also remove the walls that contained those trims and moldings. Even though walls and drywall were eventually removed and replaced during reconstruction, in order to safely remove all materials, it is not unreasonable that plaintiff had to remove any trim, such as baseboards and shoe moldings, before its employees could safely remove drywall without causing damage to the house's framing. Trim is attached with nails and would be nailed into the studs. It is not reasonable to simply tear out drywall without first dismantling any wood trim affixed to the drywall and studs. The same holds true to removing baseboard heating covers. Defendants have not shown that the charges for these services are duplicative, unlike wallpaper removed from a wall that was taken down.

Defendants also claim that separate charges for removing both sinks and any attached fixtures were duplicative. For instance, they argue that the removal of plumbing lines, faucets, and a garbage disposal should all be considered as part of the removal of a sink. Those items must be carefully removed to keep the water lines and drain lines intact so they are not damaged for the installation of new fixtures. Defendants have failed to show that separate charges for the multiple steps involved in removing sinks in the home were unreasonable.

Defendants are correct that there were two charges for bathtub removals at $75.01 each for different bathrooms. The testimony at trial established that defendants had only one bathtub in the house. In addition, the photographs of the house show that the one bathtub remained even after walls were removed, so it does appear that any bathtubs were removed. Defendants are entitled to an adjustment for $150.02.

Defendants challenge charges included in the final invoice for removing water from the crawlspace. The amount of water removed from the crawlspace was reported to be 956 gallons. Defendants simply argue that because the water was removed early on in the process, that this figure cannot be correct. But they rely solely on speculation to challenge this figure. Defendants offered no evidence to show that the amount of water plaintiff claimed to have removed from the crawlspace is inaccurate to show that the charge was unreasonable. Similarly, they allege that the crawlspace was not cleaned or treated for mold and mildew, but they have offered no evidence to dispute plaintiff's statement for these services.

Defendants also claim that they paid for the portable storage unit at their house and it was error for plaintiff to charge for a moving or storage unit and the expense of delivering and returning it. These entries show the charge is for "Job-site moving/storage container" and "Job-site moving container." Dr. Thibault described paying for a PODS unit to store their personal belongings, but he did not produce any records to show that what they paid for was the same storage unit. While defendants testified that they paid for a storage unit, plaintiff may have required the use of its own unit at the site for its supplies and equipment while the house was in the process of being restored. Defendants have not shown that plaintiff did not arrange for its own moving or storage unit for which it properly sought reimbursement.

Defendants also claim that there were duplicate charges for the removal of attic insulation. Plaintiff separately charged for the removal of batt insulation and blown-in insulation. Defendants have not explained how these charges are erroneous when they involve different types of materials, which likely involved different types of equipment to remove the insulation.

Defendants also seek setoffs for other expenses they paid. The trial court rejected any claim for a setoff or recoupment.[2] Defendants claim that they were entitled to $6,000 as a setoff for the payment they made to Eric Carlin (Carlin) for his work. Shortly after the fire, Carlin, a builder, met with defendants about rebuilding their home. Carlin recommended plaintiff to perform the remediation work before Carlin could begin to reconstruct the house. While Carlin ultimately was not hired to rebuild the house, he offered some assistance to defendants and also to plaintiff while the house was being prepared for reconstruction.

Dr. Thibault testified that he paid Carlin $6,000, but Carlin denied that it was for work he or his crew performed for plaintiff. Carlin testified that his crew helped remove cement flooring with plaintiff's staff and it was that work for which Carlin never received payment. If true, that meant that plaintiff owed Carlin. According to Dr. Thibault, Carlin was paid for materials he purchased for reconstructing the house. Defendants have not established that they were due a recoupment for the payment defendants made to Carlin.

Defendants again claim that they paid their electrician early on for the work setting up temporary power sources and lighting. Defendants claim that any charges for lighting by plaintiff must be duplicative and should have been removed from the final invoice. We disagree. Simply because temporary power and lighting were provided early on by the electrician does not prove that any subsequent power or lighting services were unreasonable. Defendants have failed to show that plaintiff billed them for unnecessary services or equipment.

Defendants also seek a recoupment for items they allege were stolen, broken, damaged, or improperly repaired by plaintiff. First, the evidence showed that there was no proof that items missing from the property were stolen or, if stolen, were taken by plaintiff's employees. There were multiple contractors working on the property, according to Neumann, and all of the items left behind by defendants were to be removed by plaintiff. The trial court rejected any recoupment for items damaged or stolen during the remediation of the house because defendants failed to offer

---

[2] On the facts of this case, it appears that defendants actually requested a recoupment, not a setoff. Briefly, recoupment allows a defendant to assert that the plaintiff failed to comply with some obligation of the contract and it offers an equitable reason why the amount requested by the plaintiff should be reduced. *McCoig Materials, LLC v Galui Constr, Inc*, 295 Mich App 684, 695; 818 NW2d 410 (2012). Recoupment is either a counterclaim for damages or an affirmative defense that must be properly pleaded. *Id*. at 694. Recoupment as a defense applies to claims arising out of the same contract or transaction. *Id*. at 695. "Setoff is a legal or equitable remedy that may occur when two entities that owe money to each other apply their mutual debts against each other." *Walker v Farmers Ins Exch*, 226 Mich App 75, 79; 572 NW2d 17 (1997). A setoff can arise out of a transaction between the parties separate from the plaintiff's cause of action. *Roemelmeyer v Roemelmeyer's Estate*, 219 Mich 322, 330-331; 189 NW 83 (1922). Because defendants sought a reduction of what they may have owed plaintiff for plaintiff's failure to properly perform its contractual duties, defendants requested a recoupment, not a setoff. See also *Mudge v Macomb Co*, 458 Mich 87, 106-107; 580 NW2d 845 (1998). Defendants also asserted recoupment as an affirmative defense when they asserted that plaintiff failed to satisfy its obligations owed to defendants, entitling defendants to an adjustment for any services not actually performed.

proof to support their request for a recoupment. Defendants therefore cannot show error on this basis.

While there was testimony from Dr. Thibault that he had to have plumbing repairs made because water lines were removed and that this cost him $2,000, it was not shown that plaintiff was responsible for causing those plumbing repairs. Plaintiff's work on the crawlspace did not include removing any plumbing. It is sheer speculation that plaintiff was responsible for that damage.

As for incomplete flooring in the laundry area, Dr. Thibault again testified that he had to hire someone to repair the flooring before that part of the house could be reconstructed. But, once again, it was not established that plaintiff was liable for the problem with the laundry flooring. Defendants did not offer sufficient evidence to associate the need to repair the flooring to plaintiff's work.

In sum, the only error that defendants demonstrated was the trial court's failure to exclude the erroneous charge for the removal of two bathtubs at $150.02.

### III. PLAINTIFF'S ISSUES ON CROSS-APPEAL

### A. PLAINTIFF'S FRAUD CLAIM

Plaintiff first argues that the trial court erred in dismissing its claim for fraud or fraud in the inducement when the trial court ruled on the parties' cross-motions for summary disposition. We conclude that plaintiff waived this claim.

In ruling on the cross-motions for summary disposition, the trial court questioned whether plaintiff was contesting the dismissal of its claim for fraud or fraud in the inducement in light of the economic loss doctrine. Plaintiff agreed that it did not need to pursue that claim because the trial court granted judgment for plaintiff on its claim for breach of contract. Accordingly, the trial court's order dismissed the fraud claim, referencing the economic loss doctrine.

The record shows that because the trial court granted summary disposition in part for plaintiff on its breach-of-contract claim, plaintiff was willing to forego its fraud/fraud-in-the-inducement claim.[3] A waiver consists of a voluntary and intentional abandonment of a known right. *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 374; 666 NW2d 251 (2003). "A party who waives a right is precluded from seeking appellate review based on a denial of that right because waiver eliminates any error." *The Cadle Co v City of Kentwood*, 285 Mich App 240, 255; 776 NW2d 145 (2009). "To allow a party to assign error on appeal to something

---

[3] At the hearing on the dispositive motions, the trial court stated that fraud and misrepresentation were inappropriate counts because the litigation "stems from a breach of contract." Plaintiff acknowledged that the trial court granted summary disposition in its favor on the breach of contract and that was the relief it was "looking for" and that relief "will suffice."

that he or she deemed proper in the lower court would be to permit that party to harbor error as an appellate parachute." *LeFever v Matthews*, 336 Mich App 651, 670 n 3; 971 NW2d 672 (2021).

Because this argument was waived in the trial court, it is not preserved. *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008) ("[A] litigant must preserve an issue for appellate review by raising it in the trial court."). See also *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 289-290; 14 NW3d 472 (2023). Although this Court may review an issue not raised in the trial court to prevent a miscarriage of justice, *Walters*, 481 Mich at 387, we do not conclude that a miscarriage of justice would result by declining to review this issue.

## B. ATTORNEY FEES AND INTEREST

Plaintiff also challenges the trial court's denial of its request for attorney fees and interest as part of its damages for breach of contract. At trial, Neumann testified that in addition to not receiving payment from defendants for services performed, plaintiff also had to pay for legal services to collect on the payment and it also incurred costs and interest. The trial court, however, declined to award these damages in its verdict. We affirm the trial court's ruling.

This Court reviews de novo the proper interpretation and application of a contractual provision. *Pransky v Falcon Group, Inc*, 311 Mich App 164, 193; 874 NW2d 367 (2015). Any related findings of fact by the trial court are reviewed for clear error. *Ladd*, 303 Mich App at 92.

With regard to costs and attorney fees, Michigan typically follows the American Rule, which provides that each side is responsible for their own fees and costs unless a statute or court rule permits a trial court to award attorney fees. *Haliw v Sterling Hts*, 471 Mich 700, 706-707; 691 NW2d 753 (2005). An exception to this rule exists if the parties to an agreement provided for an award of attorney fees; then, a court may enforce such a provision unless contrary to public policy. *Pransky*, 311 Mich App at 194. Where a party's request for attorney fees derives from a contract, the claim is treated as any other contractual term and is considered part of the request for damages. *Id*. at 194-195. The trial court may not award attorney fees in a postjudgment order if based on a contractual agreement and the issue was not addressed as a claim in the underlying litigation. *Id*. at 195.

In his testimony, Neumann explained that he was asking that the court award plaintiff attorney fees, costs, and interest for defendants' failure to timely pay the final invoice because the parties' contract allowed for the recovery of those items. Neumann believed that the interest due on the charges was a little more than $8,000 at the beginning of the trial. He estimated that plaintiff spent around $30,000 in attorney fees and about $1,500 for court costs.

The relevant portion of the contract states as follows:

If any amounts owing to Provider for Provider services are not covered by insurance, Customer agrees to pay those amounts to Provider immediately upon receipt of invoice. It is fully understood that Customer and its agents, successors, assigns and heirs are personally responsible for any and all deductibles and any costs not covered by insurance. Interest and finance charges will be charged at the maximum allowable by law, or at 1.5% per month, whichever is less, in addition to

-14-

collection or attorney fees (if applicable), on accounts over thirty (30) days past due. *Time is of the essence*.

While it was clear that defendants never paid the final invoice, in its findings, the trial court explained why it would not award attorney fees or costs:

> In making findings of fact based upon a preponderance of standards [sic] this Court's determination of reasonable price is much lower than what plaintiff ultimately submitted, and the price requested during these proceedings, despite repeated acknowledgements that the invoice was inaccurate. Due to that fact this Court is not ordering attorney fees or costs as that would be inappropriate when there has been repeated representations that the total bill is one in which the plaintiffs [sic] have acknowledged is not the correct total bill.

In sum, the trial court would not award fees or costs when defendants were correct, in part, for not paying the bill due to inaccuracies in the final invoice.

The parties' contract allowed for plaintiff to collect attorney fees and interest if defendants did not timely pay the final invoice.[4] But, the trial court ruled that payment was not due here because defendants were never given an accurate final invoice. Indeed, the amount owed was not finalized until the bench trial on damages concluded. Under the circumstances, the trial court did not err because defendants were successful in challenging the total amount plaintiff said they owed by demonstrating that plaintiff's final invoice was inaccurate. Due to the errors made in that invoice, the trial court declined to fault defendants for failing to timely pay what was allegedly due under the contract.

## C. DAMAGES

Plaintiff also argues that the trial court clearly erred by reducing some of the amounts it charged for its services. We agree that the trial court should revisit its findings on plaintiff's use of multiple hydroxyl generators.[5]

Plaintiff contends that it was error for the trial court not to award it the expenses associated with the use of hydroxyl generators, which it included on its final invoice for a total charge of $18,930.24. Four units were used for 21 days each. The trial court, however, concluded that only one unit was used, stating:

> This Court disagrees and finds that Mr. Neumann's testimony establishes the basis for billing of generators and power cords, volume two at 21 through 23. And, further, as the Court has indicated, Xactimate is an appropriate means to determine the price of such equipment and the use of such equipment, and as the

---

[4] This contract did not contain the typical broad language that required a defendant to hold the plaintiff harmless for any and all fees and costs incurred.

[5] Hydroxyl generators were apparently used to remove smoke odors and other contaminants.

testimony and the exhibit number—and the exhibits established that four hydroxyl generators were used for 21 days with the end amount of $18,930.24 being charged.

However, although the Court does find that again that Xactimate was appropriate and the Court can refer to the exhibit and the testimony, looking at all these—looking at the exhibits and looking at the testimony specifically there was a question posed that says, all right, so we got two air movers and the hydroxyl generator and the other photo, and again if there was other equipment out there, we would expect to see it in the photos, right? And the answer was, correct. That's at volume three, page 109, Mr. Neumann had indicated that the photos would depict these hydroxyl generators.

* * *

And volume two, pages [sic] 64 Mr. Neumann says that he had other jobs and had to rent one additional unit, and then look to the invoice—then he looked to the invoice, Exhibit 4, and said that there was a rental of four.

In this Court's estimation it is unclear if the rentals went to other jobs, how many rentals went to other jobs, if they did. It seems apparent that some went to other jobs and some were [used] in this job. It also seems that there may have been hydroxyl generators used that were owned already by Mr. Neumann's company, by the Shel-Den Corporation, but it's unclear as to how many. He did say that if the Thibault's [sic] were billed for four units, then you should see four units in the photographs. That's at volume three, page 94, and he directs his employees to actually photograph these units. That's at page 95.

But what's uncontroverted from the testimony [sic] that in fact only one is depicted in these photographs, and if there is only one hydroxyl generator depicted in the photograph and there's no testimony to confirm or dispel that in fact there is others on site, the Court cannot find by a preponderance of the evidence that the balance of three onsite as well. There simply is no testimony from Mr. Copley, from Mr. Neumann, [or] from anyone to suggest that these hydroxyl units were on site other than the one that's depicted in the photograph. And if only one unit was used, that's a total of $4,732.56, a difference of $14,197.68.

Plaintiff asserts that Neumann's testimony supported this element of its damages, but Neumann relied on the final invoice that four units were used and also his experience, by explaining that four units were necessary for this job. The only other evidence the trial court could rely on to prove that four units were in use was the photographic evidence, which the trial court believed showed only one generator.

Plaintiff contends that hydroxyl generators are visible in multiple photographs and that it is apparent that more than one unit was used because the numbers "1," "2," and "3" appear on units in Photographs 352, 373, 693, 710, and 846 in Plaintiff's Exhibit 5. This evidence substantiates plaintiff's damages request because it does appear that there were multiple units visible in the house over the time plaintiff was working on this project. While it cannot be said

-16-

that the three units identified above were in the house for the full amount of time claimed by plaintiff, this information supports requiring the trial court to revisit this issue because the trial court reduced the damages on this element solely because it believed that the photographs showed only one unit in use, contradicting the final invoice's charge for four units.

Accordingly, the trial court may have clearly erred in its factual finding that reduction from four units to one unit was warranted because only one unit was visible in the photographs. For this reason, we remand this matter to the trial court to review its findings on this element of the damages. The trial court may determine whether this element of damages should be modified to account for three units and, if so, by what amount.

Plaintiff also contends that the trial court wrongly found that plaintiff overcharged for content manipulation. Plaintiff originally charged defendants a total cost of $13,309.24 for content manipulation, which generally involves moving personal property out of the house and disposing of it in dumpsters. The trial court explained in its findings that plaintiff had overcharged for content manipulation:

> Speed Clean could not explain—or the second contention is from the defendant[s] is that Speed Clean could not explain the 269 hours of content manipulation charges for multiple technicians to sort, organize and move content into another area when it didn't do such work, and, further, photographs clearly show that the contents were out of the home by the end of day two of the work. That's at trial, volume one, pages 173, 184, 190 through 205 and 249 also citing volume two, [p]ages 39 through 42, that the defendant [sic] cites for this proposition.
>
> Mr. Neumann, to buttress that contention, did agree that content manipulation was, quote, heavy on the front end of the project. That's at page 172. And as far as content manipulation is concerned, Mr. Neumann also testified that, quote, again that was the thing that we said we'd have to talk to [Copley] on. As far as that goes, I couldn't comment on that. That's volume one, page 349, and again I would reiterate that Mr. Copley did not testify.
>
> Mr. Neumann was unable to explain, and I would also note that no employees that were on site testified as to the work that they performed or witnessed being performing. The only person that testified in regard to the work that was done was Mr. Neumann, who although he did indicate that he was intimately aware with all ongoing's [sic] of the project, deferred to Mr. Copely [sic] on a number of occasions during the course of this trial.
>
> Mr. Neumann was unable to explain how content manipulation was changed from 24 hours to 2.4 hours in the hallway. That's at volume one, page 206. At pages 225 and 226 he was not able to explain or justify 3.75 hours for content manipulation of a bathroom as to whether items were removed from the drawers of a vanity or the vanity was simply thrown away.

-17-

The photographs in Mr. Neumann's testimony support the defendant's contention that most of the contents were removed the first two days, and those first two days workers worked a total of 81 hours, 81 and a quarter hours. That's at volume one, page 1084 [sic], also Exhibit Number 4. Though this Court recognizes that some contents were present as late as January 3rd, as pointed out by plaintiff as depicted in Exhibit 5, the Court cannot—it did not appear that many contents were in the home at that point and again that most contents were removed in the front end within the first two days.

The Court also notes that plaintiff has the burden, and this Court at most is able to find that the workers dedicated themselves to content manipulation to a total of 81 and a quarter hours minus the 24 hours that they ostensibly dedicated to cleaning the ceiling on the first day, which leaves a balance of 57 and a quarter hours, at $45.00 an hour for a total of $2,576.25, which must be subtracted from the total invoice of $12,105.00. So, total that must be subtracted is $9,528.75, which must be subtracted from the total invoice bill.

The trial court reduced the charges for content manipulation by a significant amount because the hours spent performing this task largely occurred at the beginning of the project. Plaintiff again argues that the photographic evidence supports awarding it the original amounts sought for this item because multiple photographs showed that there were still substantial amounts of personal property in many rooms of the house beyond the first two days plaintiff worked at the house.

After reviewing these photographs, it is apparent that there still were personal belongings that needed to be removed from the house after the first two days. But, the trial court noted that fact in its findings and it conceded there was some content manipulation beyond the first two days. We cannot conclude that plaintiff has shown clear error with the trial court's findings on this element of its damages when the trial court was aware that plaintiff's employees continued to remove items from the house after the first two days.

In sum, the trial court possibly erred by reducing plaintiff's damages because the photographic evidence may reflect that more than one hydroxyl generator was used at the house during this project. Because it appears that plaintiff may have had three different units at the house, the trial court should review its findings on this element of damages. However, plaintiff has not shown that the amount of belongings left in the house after the first two days merited having the trial court revisit its findings on plaintiff's damages regarding content manipulation.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Adrienne N. Young
/s/ Anica Letica
/s/ Daniel S. Korobkin

-18-